415 A.2d 413

Lawrence CATINA, Rocco Catina and Anita Catina, His Wife, Appellants,

v.

Alfred E. MAREE and Burke Chevrolet Sales, Inc.

Lawrence CATINA, Rocco Catina and Anna Catina,[1] His Wife, Appellants,

v.

ALFRED E. MAREE, SR., INC.

Superior Court of Pennsylvania.

Argued March 20, 1979.

Filed Nov. 27, 1979.

Reargument Denied Feb. 19, 1980.

*Southeastern Pennsylvania Transportation Authority,* 7 Pa. D & C 3d 545 (Phila. Co. 1978).

1. It is unclear why Mrs. Catina's first name is given as Anita in No. 2311 and Anna in No. 2312. The Notes of Testimony indicate her first name is Anita.

248

Sandor Yelen, Wilkes-Barre, for appellants.

Richard J. Confair, Wilkes-Barre, for appellee.

Before PRICE, SPAETH and LIPEZ, JJ.

PRICE, Judge:

On November 19, 1968, appellant Lawrence Catina was struck by a vehicle driven by appellee Alfred E. Maree. As a result of the accident, Mr. Catina sustained serious personal injuries, including permanent brain damage, amnesia, and permanent damage to his right knee and arm. He was hospitalized for one year and totally disabled for five. No legal action was taken in the matter until November of 1970 when separate complaints were filed against the driver of the vehicle and Burke Chevrolet Sales, Inc., and against Alfred E. Maree, Sr., Inc.[2] The parties and issues were joined, and a jury trial finally commenced on May 3, 1976. A verdict was returned in favor of appellees, and subsequent to the denial of a motion for a new trial, these appeals were perfected.

Initially, there is no dispute that Alfred Maree actually struck Lawrence Catina, the point of contention being whether the victim was struck on or off the road surface. Similarly undisputed is the immediate physical setting of the accident and the participants, those being as follows. On November 19, 1968, Lawrence Catina, accompanied by his brother Anthony R. Catina, arrived at the parking lot of the U. S. Army Reserve Center, Route 315, Plains Township, for the purpose of attending a Reserve meeting. The parking

---

**2.** The cause of action against Burke Chevrolet Sales, Inc. was discontinued prior to trial. The parties also stipulated that because Alfred E. Maree was acting in the employ of Alfred E. Maree, Sr., Inc. at the time of the accident, a finding of liability against the former would also conclude the question against the latter on the basis of respondeat superior.

lot is separated from the Reserve Center by Route 315, a four lane highway accommodating two lanes each of north and south bound traffic. A dirt berm runs along both sides of the highway, and a twenty foot wide driveway connects the parking lot with the southbound lane. No signs in the immediate area indicate the presence of either the center or the lots, nor are there any crosswalks, lights, or signs disclosing any type of pedestrian crossing.

The actual details of the accident, however, are obscured in the haze of discordant recollections so common to this type of incident. Robert Yurksis, a witness presented by appellants, testified that at the time of the accident, he was standing on the easterly side of the highway near the Reserve Center, diagonally across from the entrance to the lot in which the Catinas had parked. He noticed one of the reservists, later identified as Lawrence Catina, walking toward the entrance and away from a larger body of reservists. At the same time, he observed a car proceeding south on Route 315, later identified as being driven by Alfred E. Maree, move off the road so that its right front tire was travelling on the berm. It continued moving forward on the gravel berm until its right front fender struck Lawrence Catina, who was still positioned approximately four feet off the highway in the middle of the parking lot driveway. Mr. Catina's body was thrown into the air and came to rest in the middle of the highway, while the vehicle pulled into one of the parking lots.

In another version of the incident, Robert W. Young, another member of the reserve unit, testified for appellees that immediately prior to the accident he was in a motionless automobile facing in a northbound direction immediately prior to making a left-hand turn into the parking lot on the west side of Route 315. From this position, Mr. Young was able to observe Mr. Maree's car for some fifteen seconds prior to the accident. It was proceeding in a southerly direction in the passing lane, with lights on and all four wheels on the highway. As the vehicle approached the entrance to the lot, Lawrence Catina, who had been standing

some six to ten feet from Mr. Young's car with two other reservists, "jumped up in the air and . . . came down in the front of that vehicle." (N.T. 596). Mr. Catina made contact with the car in the center of the hood, and the impact threw his body to a point three or four feet from the yellow center line.

A second witness for appellees, one Louis Jakubczyk, testified that he was a member of the reserve unit and on the evening of the accident had parked in the vicinity of the southerly parking lot. He exited his car and walked to the berm, stopping approximately five to six feet from the highway and in front of the opening to the southern lot. At this point, he noticed a fellow reservist, later identified as Lawrence Catina, standing twenty feet to his left and five to six feet from the roadway. Mr. Jakubczyk turned to observe traffic from the right and as he started to turn his head back to the left, he heard a loud noise. He then looked straight across the road, noted a car passing in front of him in the non-passing lane of Route 315 south, and a body lying a hundred feet south of his position on the roadway. The witness could not be certain if that car was driven by Mr. Maree because of the heavy traffic on the road. He did not see the actual impact.

Finally, Alfred Maree testified that on the date of the accident, he was travelling south on Route 315 at approximately forty-five miles per hour in the non-passing lane. The evening was clear and dry, and visibility good. He noticed no markings for a crosswalk, signs indicating such a walk, or traffic control lights. As he approached the accident scene, he noticed no reservists, but saw one car in the northbound lane facing towards him with its left turn signal flashing. As he passed the plane of the motionless car, appellant moved out into the road and made contact with the right front portion of Mr. Maree's auto at a time that the vehicle was entirely on the roadway.

The jury chose to believe the witnesses for appellees and returned a verdict in their favor. Appellants now make

numerous allegations of error,[3] none of which, either separately or in conjunction, merit the award of a new trial.

■ Appellants argue initially that the trial court erred with respect to certain testimony offered by Robert Yurksis. That witness responded thusly when asked whether Mr. Maree's auto veered in any direction after it had allegedly left the highway and before it struck Mr. Catina:

"A.   Before he hit him, no, he just, *it looked liked he just,* when I first seen him I don't know how he got over there, when I first seen him off the road he just, you know, he just stayed off the road and I don't know, maybe he tried to get it back on or not, but he didn't ____ ;"   (N.T. 21) (emphasis added).

On objection by appellees' counsel, the entire question was stricken by the trial judge.   We can perceive no error here. In *Shaffer v. Pittsburgh,* 336 Pa. 273, 9 A.2d 395 (1939), the plaintiff was attempting to prove constructive notice of a sidewalk hole caused by the absence of a small glass disc. One of the plaintiff's witnesses testified that " 'it looked kind of dirty; it looked like it had been out for a while' ". *Id.,* 336 Pa. at 275, 9 A.2d at 396.   The remark was stricken and the action affirmed by our supreme court, "because the statement was not really descriptive of a fact but amounted to an inadmissible expression of opinion [citations omitted]." *Id.*

Appellants concede that a portion of the answer was improper for this reason, but argue that since part of the statement was acceptable, the objection to strike the entire response should have been overruled.   *See Smith v. Cunningham Piano Co.,* 239 Pa. 496, 86 A. 1067 (1913); *Hamilton v. Pittsburgh, B. & L.E.R. Co.,* 194 Pa. 1, 45 A. 67 (1899).   It does appear that the witness' first words to the effect that the car did not veer are free of the objectionable expression of opinion that taints the latter portion of the answer.   This,

**3.** Appellants ordinarily filed 176 reasons in support of a motion for a new trial.   These were reduced to approximately 135 at argument, and they now advance 15 allegations of error, several of which have distinct subarguments.   With the exception of minor contentions that we deem totally without merit, we address these points seriatim.

however, is hardly cause to complain, for on the second succeeding question, the witness stated that the vehicle turned neither left nor right prior to striking the victim. The same information was consequently placed before the jury, and if counsel wished to specifically use the word "veer" again, he could have readily done so. Thus, if any error was committed, it was patently harmless.

■ Appellants' second argument concerning this witness' testimony is that the court erred in not allowing him to give an opinion as to the speed of Mr. Maree's vehicle. Concerning this, appellants correctly note that there is no absolute prohibition on laymen testifying regarding the speed of a moving vehicle. *Guzman v. Bloom,* 413 Pa. 576, 198 A.2d 499 (1964); *Sapsara v. Peoples Cab Co.,* 381 Pa. 241, 113 A.2d 278 (1955) (per curiam); *Radogna v. Hester,* 255 Pa.Super. 517, 388 A.2d 1087 (1978); *Cartmel v. Williams,* 207 Pa.Super. 144, 215 A.2d 282 (1965); *Kozemchak v. Garner,* 163 Pa.Super. 328, 61 A.2d 375 (1948). The witness may be deemed competent to testify on this point so long as he observed the vehicular movement and possesses impressions of vehicles at similar speeds. *Shaffer v. Torrens,* 359 Pa. 187, 193, 58 A.2d 439, 442 (1948); *Radogna v. Hester, supra,* 255 Pa.Super. at 520, 388 A.2d at 1088. As we have just recently noted:

> "[D]ecisions have required that the witness have something more than just a 'fleeting' glance of the vehicle in question, *Early [Ealy] v. New York Central R.R. Co.,* 333 Pa. 471, 5 A.2d 110 (1939); *Anderson v. Penta [Perta],* 138 Pa.Super. 321, 10 A.2d 898 (1939), the important consideration being that the witness have at least a minimum of time to make a reasonable estimation of speed. Cases which have rejected a witness' observation because the witness did not see the vehicle in motion for more than a few feet before the collision have indicated that the witness' testimony was not admissible because of the brevity, the fleeting nature of the observation. However, the court has never attempted to establish any minimum distance requirement for competency of lay witness estimates.

There are other cases in which the distance traveled by the moving vehicle during the period of observation has been appreciable, yet the court has rejected the witness' testimony because the moving vehicle had come directly toward the witness, making any estimation of speed speculative. The test for admissibility of lay witness estimations of speed, therefore, is not strictly connected with evidence of the distance traversed by the vehicle in question but, rather, depends upon the existence of an overall opportunity for adequate observation, in addition to the witness's prior experience with moving vehicles." *Radogna v. Hester, supra*, 255 Pa.Super. at 520–21, 388 A.2d at 1088–89 (footnotes omitted).

Instantly, the witness testified that he had an unobstructed view of the auto on a diagonal for two to three seconds and thirty-five feet prior to it striking Mr. Catina. The vehicle's speed was constant prior to striking the victim and his total observation time was some five or six seconds until Mr. Maree's car came to a full stop. Mr. Yurksis also testified that he was in general familiar with the passage of time and the relative speed of moving objects, and that he had been a licensed driver for sixteen years. The trial court disallowed the speed testimony on the basis of Mr. Yurksis' angled view of the car, limited observation time, and the short, thirty-five foot distance during which observation was possible.

We note first that questions concerning the admission or exclusion of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent a clear abuse of discretion. *Radogna v. Hester, supra; Westerman v. Stout*, 232 Pa.Super. 195, 335 A.2d 741 (1975); *Cartmel v. Williams, supra*. On the present facts, we fail to see any abuse in the rejection of the testimony. An observation period of thirty-five feet, on a diagonal, and on a poorly lit road is hardly sufficient to judge the speed of any but the slowest moving vehicle. As we noted in *Radogna*, if the distance of observation is exceedingly small, the court may refuse to allow an estimate of speed because it is apparent

that the witness had only a fleeting glimpse of the vehicle. *See also Kelly v. Veneziale*, 348 Pa. 325, 35 A.2d 67 (1944) (vehicle 5 to 10 feet away); *Ealy v. New York Central R.R. Co.*, 333 Pa. 471, 5 A.2d 110 (1939) (train 25 feet distant when first seen). Even assuming a speed no greater than the forty-five miles an hour testified to by Mr. Maree, the vehicle would have traversed the thirty-five feet in approximately ½ second, while at a speed of sixty-five miles per hour, the distance would have been travelled in approximately ⅓ second. An estimate of speed may not be predicated on such a slender data base, and the testimony was properly excluded.

Appellant next argues that Mr. Young should not have been allowed to testify because he was not listed as an eyewitness in the answers to interrogatories supplied by appellees. The facts are these. The original interrogatories filed by appellants upon appellees requested the names of eyewitnesses to the accident under Interrogatory No. 1, and persons with knowledge of the conditions at the scene under Interrogatory No. 2. Mr. Young was not listed as an eyewitness to the accident in appellees' answers although he was classified as a person with knowledge of the conditions at the scene, and was subsequently listed in appellees' supplemental answers as a person expected to be called during trial.

Pa.R.C.P. 4019 states in pertinent part that "[t]he court may, on motion, make an appropriate order if (1) a party indefinitely fails to file answers or sufficient answers to written interrogatories served under Rule 4005; . . ." No specific sanctions are suggested, and the imposition of any sanction rests within the sound discretion of the trial court. *Tener v. Loblaw, Inc.*, 207 Pa.Super. 337, 217 A.2d 787 (1966). *See also Nissley v. Pennsylvania R.R. Co.*, 435 Pa. 503, 259 A.2d 451 (1969); *Moore v. Howard P. Foley Co.*, 235 Pa.Super. 310, 340 A.2d 519 (1975). The importance of a party having adequate and accurate information on the eyewitnesses to be called by an adverse party is, of course, manifest. If the witness' trial testimony is damaging to the

uninformed party, he is subject to the vagaries of surprise and attendant detriment in the eyes of the jury; while if the witness is in possession of facts favorable to the uninformed party, the latter is deprived of potentially crucial information. *See* 10 Goodrich Amram 2d 158–61 (1978). We do not believe the evidence that appellees concealed the name of their witness so clear as to find an abuse of discretion. Appellants knew of Mr. Young from the police report and from the supplemental answer. There was sufficient time to interview him had they so chosen. Although it is true that appellees did err in not correctly classifying the witness or identifying him prior to trial, no evidence was adduced to indicate that it was a willful action designed to secure an unfair advantage. It was consequently not erroneous to refuse to impose sanctions.

Appellants next contend that the trial court erred in limiting their cross-examination of appellees' witnesses. Initially, we note that the scope and extent of cross examination are within the discretion of the trial judge, and again, we must find a clear abuse of discretion or an error of law in order to reverse. *Townsend Will*, 430 Pa. 318, 241 A.2d 534 (1968); *Copper Plumbing, Inc. v. Macioce*, 225 Pa.Super. 236, 310 A.2d 411 (1973); *Solomon v. Luria*, 213 Pa.Super. 87, 246 A.2d 435 (1968). In the numerous instances complained of by appellants, the court forbid counsel from constantly repeating the inconsistent testimony offered by prior witnesses, ruling that the matter of credibility was for the jury and that counsel would be able to argue those inconsistencies in his closing address.

Such a ruling was wholly proper. The purpose of cross examination is, *inter alia*, to afford the opportunity to elicit answers that will impeach the veracity, capacity to observe, impartiality, and consistency of the witness. Thus, it is permissible to confront the witness with inconsistent prior statements or established facts inconsistent with his testimony. Once it is established that such a contradiction exists, however, it is neither necessary nor proper to argue with the witness concerning the truth of his statement.

That may be presented to the jury during counsel's closing address, and the jury may then consider that discrepancy in evaluating the witness' credibility.

Appellant next argues that the testimony of Louis Jakubczyk should not have been admitted, both because he was not an eyewitness and because his testimony was irrelevant. We disagree. As noted previously, the offer of proof indicated that Mr. Jakubczyk was not an eyewitness and that he could not identify either appellant or Mr. Maree's vehicle; only that he saw a reservist twenty feet to his left and six feet off the road, turned to his right, heard a loud noise, turned partially to his left again, and observed a car move by and appellant lying in the road. He also testified that he did not hear any sounds of flying gravel.

First, after reviewing the offer, we deem it sufficiently detailed to allow the trial judge to make an intelligent ruling on its presentation. *See Nissley v. Brubaker*, 192 Pa. 388, 43 A. 967 (1899); *Kelly v. Kelly*, 51 Pa.Super. 603 (1912); *Muntz v. Whitcomb*, 40 Pa.Super. 553 (1909). Second, the testimony was sufficiently relevant to be admitted.

Evidence is relevant when it tends to make the fact in issue more or less probable or intelligible. *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978); *Gregg v. Fisher*, 377 Pa. 445, 105 A.2d 105 (1954); *Commonwealth v. Harris*, 270 Pa.Super. 498, 411 A.2d 828 (1979); *Commonwealth v. Kramer*, 247 Pa.Super. 1, 371 A.2d 1008 (1977); 1 Wigmore, Evidence §§ 9–10 (3d ed. 1940). As Professor McCormick formulates the question "Does the evidence offered render the desired inference more probable than it would be without the evidence?" McCormick, Evidence § 185 (2d ed. 1972). Quite aside from describing the area and general conditions, the witness' testimony was relevant precisely because he did not testify to hearing any sound other than a loud bang. Presumably, if the vehicle had been travelling on the berm, the sound of wheels on gravel would have been fairly distinct at twenty feet. Thus, the proposi-

tion that the vehicle did not leave the road was made more probable by the non-perception of the sound. Of course, the weight to be assigned this testimony was for the jury, but its logical relevance entitled it to be admitted.

■ Appellant next argues that Louis Jakubczyk should not have been allowed to read the whole of his statement given to the U. S. Army Reserves on the night of the accident. The matter was precipitated when counsel for appellees requested the witness to read the entire statement because during cross-examination, appellants' counsel had employed that statement to demonstrate certain inconsistencies in the witness' trial testimony. Specifically, the witness on cross-examination testified that he was standing to the right (south) of Mr. Catina, while he stated in his deposition that he was to the left (north) of the victim. Further, he stated in the deposition that he actually witnessed the impact, while at trial he denied this. On this point we agree with appellants.

In *Commonwealth v. Marino*, 213 Pa.Super. 88, 102, 245 A.2d 868, 875 (1968), *aff'd*, 435 Pa. 245, 255 A.2d 911 (1969) (emphasis added), this court stated that "if some portions of a statement made by a witness are used on cross-examination to impeach him, other portions of the statement *which are relevant to the subject matter on which he was cross-examined may be introduced in evidence to meet the force of impeachment.*" *See* 3 Wigmore, Evidence §§ 1045, 2114 (Chad. Rev. 1970). Such a rule is salutory and prevents statements from being taken out of context. Wigmore illustrates this as follows: "[I]f a person is charged with saying 'There is no God,' he appeals to the preceding clause, 'The fool hath said in his heart'; the total effect is to remove the first impression that the speaker has himself asserted atheism, and to show that he has merely attributed the atheistic utterance to a fool; . . . ." VII Wigmore, Evidence § 2113 (Chad. Rev. 1978). Instantly, however, more of the statement was admitted than was necessary to meet the force of the impeachment, which was confined to the narrow point of the victim's location with respect to the

witness. In admitting the entire statement to, "show the excited nature of the statement" (Brief for Appellees at 26), the court was permitting appellee not to explain the impeaching testimony, or place it in context, but to demonstrate further inconsistencies which would cast considerable doubt on the totality of the witness' testimony. This essentially permitted appellees to impeach their own witness. Although the rule that a party cannot impeach his own witness has been considerably relaxed, *see Commonwealth v. Gee*, 467 Pa. 123, 354 A.2d 875 (1976); *Commonwealth v. Dancer*, 452 Pa. 221, 305 A.2d 364 (1973), one cannot presumptively decide to completely strip a witness of his credibility after it has been damaged through cross-examination.

Nevertheless, we consider the error *de minimus*, particularly in light of the fact that an objection was not interposed until most of the statement had been read. Moreover, Mr. Jakubczyk's statement and trial testimony were so inconsistent as to severely compromise his credibility in the eyes of the jury. Although it is true that admission of the testimony permitted appellee to confront the jury with a statement by a purported eyewitness corroborating other testimony that the victim was struck on the road, in light of the witness' recantation of this at trial under oath, we believe this error does not warrant a new trial.

■ Appellant next contends that the court erred in admitting testimony as to the cost of repairs to the right fender of Mr. Maree's automobile ($7.00 for labor, $7.00 for parts, total of $2.30) [4] as opposed to the total repair bill of $235.80. He argues that it was not only irrelevant, but

---

4. Mr. Maree's testimony on the total damage estimate to the right side of the auto was confusing. When asked to read from the damage estimate with respect to the right fender, Mr. Maree indicated that "[u]nder labor it was $7.00, the paint was $7.00." (N.T. 735). But when asked to read the column titled total amount, the witness stated $2.30. Although the trial court indicated that it would strike the testimony if an explanation for this incongruity were not forthcoming, none in fact was provided. Nevertheless, the import of the testimony is clear; in relation to the total bill, the amount of repairs on the right side of the car was small.

highly prejudicial in that the jury could infer that the left side of the automobile struck appellant since most of the damage was concentrated on that side. We cannot agree because first, appellants were quite prepared to have the entire estimate read, (N.T. 735) which presumably would have revealed the same information. Second, Mr. Maree on direct examination had testified that he could observe no damage to the right front fender, testimony which the estimate merely corroborated. Third, appellants themselves had previously attempted to introduce the damage estimate, but it was refused by the court because it contained references to insurance. Fourth, appellants had previously read the damage estimate to the jury in order to show the extent of the repairs. In light of these considerations, we see no error in the introduction of the testimony.

Appellants next contest the trial court's limitation of their closing address. The contention is based on the trial judge's instructions to counsel not to refer to insurance or investigators in his closing address (N.T. 824), even though during trial, Officer Leonard Sarnick made the following reference on cross-examination during his explanation of a diagram of the accident scene:

"A. Again, this is only to show, in fact, in fact, I don't know, if I didn't put the automobile in there you wouldn't have any indication of which way the man was supposed to be travelling, this is so that the investigator from the insurance company could get a general idea just how that happened." (N.T. 171).

No objection was made by appellees to this answer, and a subsequent objection was overruled as untimely made. (N.T. 582).[5]

It has long been the case that evidence of liability insurance is inadmissible in a negligence action due to its potential for prejudice. *Price v. Yellow Cab Co.*, 443 Pa. 56, 278

5. The trial judge conceded that the objection would have been granted had an objection been made at the time of the remark.

A.2d 161 (1971); *O'Donnell v. Bachelor*, 429 Pa. 498, 240 A.2d 484 (1968); *Frank v. Peckich*, 257 Pa.Super. 561, 391 A.2d 624 (1978). Similarly well settled is the fact that while counsel generally has great latitude in the closing argument, *Millen v. Miller*, 224 Pa.Super. 569, 308 A.2d 115 (1973), the trial judge at his discretion may circumscribe the bounds of legitimate advocacy. *Abrams v. Philadelphia Suburban Transportation Co.*, 438 Pa. 115, 264 A.2d 702 (1970); *Trayer v. King*, 241 Pa.Super. 86, 359 A.2d 800 (1976). Conjoining these two principles, we do not believe the court erred in forbidding the reference to insurance. Although it is true that some evidence of insurance was in the record as a result of counsel's failure to object at the time of its introduction, this does not open the floodgates and allow opposing counsel to continually emphasize that fact. While it may be argued that the damage, as such, is already done, it was incumbent upon the trial judge to minimize its extent. We can therefore perceive of no error.

Appellant next advances eight separate instances of error in the trial court's charge to the jury. In analyzing each, we must refrain from taking "the challenged words or passage out of the context of the whole charge, but must look to the charge in its entirety . . . to determine whether or not error was committed and whether that error was prejudicial to the complaining party." *Whitner v. Lojeski*, 437 Pa. 448, 454, 263 A.2d 889, 892 (1970).

█ We need not concern ourselves with the first two allegations, for they were not raised following the charge and are thus waived. *Dilliplaine v. Lehigh Valley Trust Company*, 457 Pa. 255, 322 A.2d 114 (1974).

█ Appellants' third objection is to the court's charge on presumptions which was as follows:

"One other matter of general reference to you, members of the Jury, you will recall the medical testimony and the defense does not contest this matter that unfortunately

Lawrence Catina has amnesia and has no recollection of the circumstances of this accident.

The law provides where an individual finds themself in that unfortunate circumstance, when a person injured in an accident has lost his memory as a result of his injuries so that he is unable to testify as to show the accident occurred the law presumes that at the time of the accident that person was using due care for his own safety.

However, this presumption may be rebutted by evidence and if you find from a preponderance of the evidence that the injured person was not exercising such care, then your verdict will be for the Defendant." (N.T. 835).

Although appellants allege that this was an incomplete exposition in that mention was not made of the effect of any possible subsequent negligence on appellees' part, a review of the record discloses the following references made shortly after the above:

"However, a driver may not carelessly inflict injury on persons lawfully using the highway between intersections. If it appears that a pedestrian crossing a street or a road between intersections was present on the highway a sufficient length of time to be seen by an approaching operator, the latter may be found negligent if he is far enough away to bring his vehicle under control or to take other action to avoid striking the pedestrian." (N.T. 838).

Taken together, these two instructions adequately cover that area of the law.

Appellants next argue, in two separate points, that the court erred in referring to the area as a business or residential district, and should not have submitted this question to the jury. Specifically, the trial court read appellees' point for charge No. 9.

" 'Every pedestrian crossing a highway within a business or residential district at any point other than a crosswalk shall yield the right of way to vehicles upon the highway.' " (N.T. 838).

The court later left it for the jury to determine from the evidence whether the area was indeed a business district or not. (N.T. 845–46). This was not error. The point for charge was merely a recitation of the duty imposed on the pedestrian by the then applicable section of the Motor Vehicle Code, 75 P.S. § 1013(c). Because there was evidence from which the jury might have found that the area was a business district, it was proper to submit the question to it.

■ Appellants next question the court's charge on the sudden emergency doctrine. As we have just recently stated:

"The purpose of the sudden emergency doctrine is to relieve a victim from the sometimes stringent reasonable man standard when he is confronted with an occurrence that permits no opportunity to apprehend the situation and act accordingly. The doctrine is applied most often in automobile cases in which a driver is confronted with an occurrence requiring some form of immediate, evasive action. *See, e. g., Stacy v. Thrower Trucking, Inc.,* 253 Pa.Super. 150, 384 A.2d 1274 (1978); *Westerman v. Stout,* 232 Pa.Super. 195, 335 A.2d 741 (1975); 3 Troutman, Pennsylvania Negligence, Sudden Emergency (1967)."

*Carpenter v. Penn Central Transportation Co.,* 269 Pa.Super. 9, 16, 409 A.2d 37, 40 (1979). Appellants contend that while the court's charge was quoted directly from Laubs' Trial Guide,[6] it failed to unequivocally inform the jury that the person confronted with the emergency must have acted in a reasonable manner in light of the circumstances. While we agree that in spite of the emergency situation the actor must nevertheless have behaved reasonably, *see Westerman*

6. Laub, Pa.Trial Guide § 619.2 (1959).

*v. Stout, supra,* we disagree on the alleged impropriety of the instruction. It is true that it would have been more accurate, and perhaps clearer, to charge the jury that an actor is always held to the same degree of care namely that of due care under the circumstances, but that an emergency situation is one factor to be considered in evaluating the behavior that would be reasonable. Nevertheless, after a careful review of the charge, we are convinced that the court adequately conveyed the concept that the person involved in an emergency does not abrogate all responsibility to act reasonably, but merely that actions which would have been reasonable when confronted with the emergency might not have been so in the absence of the emergency.[7]

Appellant next contests the court's failure to distinguish between an inference and a presumption. Specifically, the court read appellants' point for charge 18:

"'When the driver's vehicle leaves the highway and causes injury and damage, you may *infer* that the driver was negligent and that the defendant-driver then has the burden of exculpating himself by an acceptable explanation that the accident occurred through no fault of his own.'" (N.T. 843) (emphasis added).

While inference and presumption are two of the most elusive members of the family of legal terms, we need not deal here with their myriad facets. Rather, the distinction may be simply drawn thusly: when a party places before the jury fact A, and asks them to deduce fact B therefrom, if the jury finds fact A, then an inference *permits* them to find fact B, whereas a presumption *compels* them to find fact B unless the other party presents evidence to rebut either fact A or the logical connection between facts A and B. In other words, a presumption shifts the burden of going forward with the evidence, while an inference does not. Consequently, it can be seen that the judge in his charge was, in fact,

---

**7.** We also note that the evidence adduced at trial was sufficient for the judge to charge on the doctrine.

describing a presumption, because he explicitly shifted the burden to appellees. Moreover, in a later charge on this same point, the court stated:

" 'If you find that the plaintiff, Lawrence Catina, was off the highway at the moment that he was hit, then you must find that the defendant's hitting him constituted negligence.' " (N.T. 857).

This certainly carries the import not only of a presumption but of a rule of law. In light of this later charge, the fact that the substance, if not the precise terminology, of the earlier charge was correct, and the prior practice of the courts themselves in occasionally using the terms interchangeably, we can perceive of no error.

Finally, relative to the charge, appellants allege that the court failed to read their submitted points for charge dealing with the assured clear distance rule. On that rule, the court charged as follows:

"As far as the assured clear distance is concerned, members of the Jury, and giving the headlights distances, as I told you, the assured clear distance would apply to the situations where Mr. Maree should, did or should have seen a pedestrian, whether he be on the side of the road or in the middle of the road, but it depends upon the circumstances of that and who he saw or should have seen and the conduct of that individual, what duties became upon him, became incumbent upon him at the time of seeing him.

In other words, if he saw a pedestrian standing alongside of the road his duties are less than if he saw a pedestrian standing in the middle of the highway, but again, you will apply that according to the circumstances you find in the case and of course, the Defendants' contention is that in either one of those events, not considering the one off the highway, if he was struck off the highway, but if he darted out or if he jumped back, the Defendants'

contention is that he was confronted with a sudden emergency." (N.T. 645).

While this was not couched in the precise terms of appellants' points for charge, we have constantly held that the language of counsel need not be used in a charge so long as the law is stated correctly. *Boyle v. Pennsylvania Railroad Co.*, 403 Pa. 614, 170 A.2d 865 (1961). Because we believe the instructions were substantively correct, there was no error.

Lastly, our judicial conscience is not so shocked as to accede to appellants' request for a new trial. This case, as in many accident situations, centered primarily on the credibility of the witnesses, and it was solely for the trier of fact to evaluate those witnesses and accord weight to their testimony. *Burbage v. Boiler Engineering & Supply Co., Inc.*, 433 Pa. 319, 249 A.2d 563 (1969). We cannot substitute our judgment for that of the fact finder when the verdict is supported by creditable evidence.

The orders of the trial court are therefore affirmed.

SPAETH, J., concurs in the result.